UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALEJANDRO MARTINEZ,

                     Plaintiff,                     01 Civ. 721 (PKC)

        -against-

                                           MEMORANDUM
                                         <u>AND ORDER</u>

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY; POLICE OFFICER PAUL
NUNZIATO, SHIELD # 865; POLICE OFFICER
PATRICK CALLAGHAN, SHIELD # 816;
POLICE OFFICER THOMAS MILLER,
SHIELD # 1000,

                        Defendants.
-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

            On February 1, 2000, during his morning commute from New Jersey to

Lower Manhattan, plaintiff Alejandro Martinez was arrested outside the men's room at

the PATH station concourse of the World Trade Center.  He was charged with the crime

of public lewdness, and remained in law enforcement custody for approximately 19 hours

before release.  Martinez was one of seven men arrested in separate alleged incidents of

public lewdness in a single restroom of the World Trade Center's PATH station

concourse between the hours of 6:05 a.m. and 8:30 a.m.  As factual support for the

charge, each was accused by the arresting officer of having engaged in public

masturbation.[1]

---

[1] "A person is guilty of public lewdness when he intentionally exposes the private or intimate parts of his
body in a lewd manner or commits any other lewd act (a) in a public place, or (b) in private premises under

Mr. Martinez was the only one of the seven arrestees who did not plead guilty to a reduced charge of disorderly conduct.  He proceeded to trial in state court, and after a one-day bench trial, he was acquitted of the charge of public lewdness.

Mr. Martinez subsequently initiated this action.  He asserted claims under 42 U.S.C. § 1983 for false arrest and malicious prosecution.  After discovery closed, I set the case for trial.  Defendants filed no motion for summary judgment.  On November 18, 2004, after a four-day trial, the jury returned a verdict in Martinez's favor on his claims against defendants Paul Nunziato, Patrick Callaghan and the Port Authority of New York and New Jersey ("Port Authority"), and awarded compensatory damages in the amount of $1,104,000: $1,000,000 in damages for emotional distress, mental anguish and loss of liberty on the false arrest claim, $1,000 in therapy expenses on the false arrest claim, $100,000 in damages for emotional distress and mental anguish on the malicious prosecution claim, and $3,000 in legal fees on the malicious prosecution claim.  The jury awarded no damages for therapy expenses on the malicious prosecution claim, and no punitive damages against Nunziato or Callaghan.[2]

Defendants now move, pursuant to Rules 50(b) and 59(a), Fed. R. Civ. P., for judgment as a matter of law, or, in the alternative, for a new trial, and for remittitur of the damages awarded to the plaintiff by the jury.

For the reasons explained below, the defendants' motions for judgment as a matter of law or for a new trial are denied.  The jury award is remitted to $464,000.

---

circumstances in which he may readily be observed from either a public place or from other private premises, and with intent that he be so observed."  N.Y. Penal L. § 245.00 (McKinney's 2000).

[2] As a governmental entity, the Port Authority is immune from punitive damages.  See Vernon v. Port Authority of New York and New Jersey, 220 F. Supp. 2d 223, 232 n.6 (S.D.N.Y. 2002).

Rule 50(b) and 59(a) Standards

Under Rule 50(b), a party may move for judgment as a matter of law or move for a new trial within ten days of the entry of judgment.  Judgment was entered on November 29, 2004, and on December 13, defendants timely filed their motions.  Rule 6(a), Fed. R. Civ. P.  Rule 50(b) permits the Court to allow the judgment to stand, to order a new trial, or to direct entry of judgment as a matter of law.  In considering a Rule 50(b) motion, a court should be deferential to the jury's role as the trier of fact.  In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), the Supreme Court held that a court considering a Rule 50 motion should review the evidence "taken as a whole."  The trial court weighs all evidence in favor of the non-moving party, and must not make credibility determinations.  Id.  "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'"  Id. at 151.

Pursuant to Rule 59(a)(1), a party may move for a new trial in an action that was tried before a jury.  Rule 59 is broadly worded, and gives the Court discretion to grant a new trial if the verdict is against the weight of the evidence or if a damages award is excessive.  Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §§ 2805-07.  A court should not set aside a jury verdict and grant a new trial unless the verdict was "seriously erroneous."  Piesco v. Koch, 12 F.3d 332, 345 (2d. Cir. 1993).  However, "[u]nlike a motion for judgment notwithstanding the verdict, a new trial motion may be granted even if there is substantial evidence to support the verdict."  Bevevino v. Saydjari, 574 F.2d 676, 683 (2d Cir. 1978).  As the Second Circuit has explained:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

Id. at 684.

A conditional order for remittitur under Rule 59 requires a plaintiff to choose between accepting the reduction of a verdict found to be excessive, or of submitting to a new trial. See Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 165 (2d Cir. 1998). A trial judge has discretion to overturn a jury award for excessiveness, and to order a new trial if the successful plaintiff refuses to agree to the reduced award. Id. "Where there is no particular discernable error," the Second Circuit has held, "a jury's damage award may not be set aside unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" Id. (quoting O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988)).

It is unclear from the defendants' papers the extent to which their motion relies upon Rule 59(a), as opposed to Rule 50(b). They contend that the jury's finding of liability on the part of the Port Authority pursuant to Monell v. Dep't of Social Services of City of New York, 436 U.S. 658 (1978), was against the weight of the evidence. The remainder of their motion is premised entirely on evidentiary rulings made during trial.[3] Nevertheless, I address the motion as seeking judgment as a matter of law, or, alternatively, a motion for a new trial.

---

[3] Elsewhere, the defendants imply that the Court erred in not permitting them to take discovery from non-party Gay and Lesbian Anti-Violence Project. (Hoey Dec. at 4) Defendants offer no legal justifications for this argument and do not contend that it is a basis for granting their post-trial motions, so I do not consider it.

4

Background

Consistent with Rule 50, I describe the facts of this case in the light most favorable to Mr. Martinez, the non-moving party.  According to Martinez's testimony, at approximately 6:05 a.m. on February 1, 2000, he entered the men's room at the PATH train station at the World Trade Center.  (Trial Tr. at 69)  He stood at a urinal, urinated, and departed the men's room.  (Trial Tr. at 69)  Officers Paul Nunziato and Patrick Callaghan, who are defendants in this action, then arrested Martinez.  (Trial Tr. at 70)  Officer Nunziato told Martinez that he had observed him masturbating in the men's room, an assertion that Martinez immediately denied.  (Trial Tr. at 70)  According to Martinez, Officer Nunziato told Officer Callaghan that he "set a good trap" when he arrested Martinez.  (Trial Tr. at 71)  The two officers directed Martinez to wash his hands, and when Martinez reiterated his innocence, Officer Nunziato said, "If you want, I can break your teeth."  (Trial Tr. at 76-77)  Martinez was placed in a cell at the WTC PATH Station, where the six additional public lewdness arrestees were brought that morning.  (Trial Tr. at 79)  According to Martinez, Nunziato stated that the men were going to remain there until the officers finished paperwork and "make our quota."  (Trial Tr. at 79)

Martinez and the other men arrested for public lewdness were transported to 100 Centre Street for processing.  (Trial Tr. at 88)  At approximately midnight, Martinez met with an attorney and appeared before a judge.  (Trial Tr. at 90-91)  The judge offered to release Martinez if he would plead guilty to disorderly conduct.  (Trial Tr. at 90-92)  Disorderly conduct is a violation under New York law, not a crime.  (N.Y. Penal L. § 10.00(3) and (6))  After consulting with his attorney, Martinez pleaded not

guilty to the public lewdness charge rather than plead guilty to the disorderly conduct offense.  (Trial Tr. at 91-92)  Martinez was released at approximately 1 a.m.  (Trial Tr. at 93)

The case against Martinez proceeded to trial before the Hon. Analisa Torres on September 29, 2000 in the Criminal Court of the City of New York, New York County.  The only trial witnesses were Martinez and the arresting officers, Nunziato and Callaghan.  Martinez described his emotional state during trial as "desperate, nervous." (Trial Tr. at 97)  Judge Torres found Martinez not guilty.  (Criminal Trial Tr. at 82)

Martinez described his arrest and prosecution as frightening, and testified that following the arrest, he experienced difficulty sleeping and became socially withdrawn.  (Trial Tr. at 97-99)  He stopped attending social gatherings, volunteer activities, and sporting events.  (Trial Tr. at 98)  More generally, he described himself as feeling anxious whenever he was in the presence of law enforcement officers.  (Trial Tr. at 100)  Martinez also asserted that he did not visit family members in Cuba because he feared that his arrest and prosecution would complicate his passage.  (Trial Tr. at 103)

In his complaint, Martinez alleged that the individual defendants, acting under color of state law, violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution, thereby giving rise to a claim under 42 U.S.C. § 1983. He alleged that he was arrested and prosecuted without probable cause, and that the Port Authority of New York and New Jersey ("Port Authority") had a de facto policy of unconstitutionally arresting men without probable cause for public lewdness at the World Trade Center's PATH station.  (2d AC ¶¶ 18-29)  Martinez also brought state law claims against the individual defendants for false arrest, false imprisonment, and malicious

6

prosecution, and asserted that the Port Authority was liable for the defendants' conduct under a theory of respondeat superior.  (2d AC ¶¶ 30-37)

This case originally was assigned to the Hon. Loretta A. Preska, U.S.D.J., who set a discovery schedule and directed the parties to engage in settlement discussions. In January 2003, the plaintiff filed his First Amended Complaint ("1st AC") and Magistrate Judge Eaton established a new discovery schedule.  The action was subsequently assigned to my docket.  In an order of July 9, 2004, I allowed plaintiff to amend his complaint to drop two claims – negligence and conspiracy – and to add an alternative theory to his Monell claim.  The Monell claim had previously been limited to assertions that the defendants targeted homosexuals for arrest and that the Port Authority inadequately trained and supervised its law enforcement officers.  The alternate theory asserted that the Port Authority had a policy, custom or practice of arresting men for public lewdness at the PATH concourse men's room without probable cause, and without observing a lewd act capable of being seen by a casual passerby.  (2d AC ¶ 25) Plaintiff's amended pleading ("2d AC") was filed on July 16, 2004.  No request was made by defendants' counsel to reopen discovery in light of the amendment.

Plaintiff's counsel wrote to me on August 16, 2004 advising that earlier that day he had received discovery requests from defendants' counsel, who asserted that defendants would not file a previously scheduled summary judgment motion until two weeks after receiving responses to their discovery requests, and then only if, in defendants' judgment, no further discovery was necessitated by those responses.  In response to the August 16 letter, I ordered as follows: "Defendants' motion for summary judgment must be filed no later than September 2, 2004 or it will be deemed waived."

(Docket Entry #37, August 20, 2004)  By setting the date more than a month away, I gave defense counsel adequate time to prepare the motion or to seek leave to conduct the requested discovery.  Defendants' counsel did neither.  In a letter dated September 24, 2004, defendants' counsel wrote to the Court stating that he was unable to file a summary judgment motion because the plaintiff failed to produce discovery requests that defendants made after the 2d AC was filed.  Counsel for defendant never sought relief from the discovery cut-off, never brought to the Court's attention a discovery dispute over the content of his post cut-off discovery requests (either under Local Rule 37.2 or otherwise) and never sought relief from my August 20 order.  Nor did defendants' counsel ever adequately explain what additional evidence the Port Authority required as to its own alleged pattern or practice.  I set a trial date for November 15, 2004.

A jury was impaneled on November 15, 2004 and, after the close of evidence, it reached a verdict on November 18.  On November 18, the jury returned a verdict finding Officers Nunziato and Callaghan liable on all claims, and finding that the Port Authority employed a policy and practice of making arrests on public lewdness charges without probable cause.  (Trial Tr. at 675-79)  For the false arrest claims, the jury awarded Mr. Martinez $1,000,000 for emotional distress, mental anguish, and loss of liberty, and $1,000 in therapy expenses.  (Trial Tr. at 676)  The jury also found that Mr. Martinez suffered $100,000 in damages arising from the emotional distress and mental anguish caused by his malicious prosecution, and awarded him an additional $3,000 in legal expenses.  (Trial Tr. at 676)  The jury found no liability on the part of Officer Miller, and did not assess punitive damages against any defendant.

Discussion

    A.  Plaintiff presented evidence sufficient for a jury to find liability on his Monell claim

The defendants argue that the Port Authority is entitled to judgment as a matter of law on the plaintiff's Monell claim against the Port Authority.  They assert that Martinez failed to establish that the Port Authority had an unconstitutional policy or practice that resulted in a deprivation of the plaintiff's constitutional rights by arresting men perceived to be gay, or arresting men without probable cause at the PATH concourse.

To succeed on a claim under Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 694-95 (1978), a plaintiff must establish that a violation of the Constitution occurred pursuant to official municipal policy.  This may be done by establishing that constitutional rights have been violated pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  Id. at 690-91.  However, a municipality may not be held liable pursuant to a theory of respondeat superior.  Id. at 691.

A custom need not be the result of formally instituted policy.  Id. at 691.  The municipality's conduct must, however, be "the moving force of the constitutional violation."  Id. at 694.  The Second Circuit has held that municipal inaction, such as the persistent failure to discipline subordinates who violate civil rights, may support an inference of an unlawful municipal policy under Monell.  Batista v. Rodriguez, 702 F.2d

393, 397 (2d Cir. 1983) (citing <u>Turpin v. Mailet</u>, 619 F.2d 196, 201, 202 (2d Cir.), <u>cert.</u> <u>denied</u>, 449 U.S. 1016 (1982)).

        Mr. Martinez submitted evidence sufficient for a reasonable jury to conclude that his arrest was part of a Port Authority pattern or practice to conduct "sweep" arrests (which are also known as "directed enforcements") for the crime of public lewdness, without regard to probable cause.  According to the testimony of Officer Robert Sbarra, who was the Operations Captain of PATH system police officers during the time of plaintiff's arrest, on the morning of February 1, 2000, the plaintiff was the first of seven men arrested for public lewdness between 6:05 a.m. and 8:30 a.m.  (Trial Tr. at 212)  Sbarra's responsibilities included deploying and monitoring the personnel under his supervision.  (Trial Tr. at 207)  The testimony of Sbarra, as related to arrest statistics for public lewdness, indicated a pattern in which public lewdness arrests peaked for brief periods of time, followed by several months in which no public lewdness arrests were made.  During Sbarra's examination by the defendants' counsel, he testified that on one day in January 1997, 30 public lewdness arrests at one WTC PATH station restroom occurred in an eight-hour time period.  (Trial Tr. at 238)  Officer Sbarra also testified that during another directed enforcement in February 1997, 30 arrests occurred in an eight-hour period, and in March 1997, 25 arrests occurred in approximately eight hours.  (Trial Tr. at 238-39)  In 1999, there were no public lewdness arrests for the months of February through December at the WTC PATH station men's room.  (Trial Tr. at 228)  From January to April of 2000, there were 46 public lewdness arrests in the WTC PATH station men's room, including the seven arrests on the morning of February 1.  (Trial Tr. at 228)

Under the express terms of the statute, it is not sufficient that a person expose private or intimate body parts: they must do so "lewdly."  N.Y. Penal L. § 245.00. As interpreted by the New York Court of Appeals, the crime of public lewdness "was aimed at protecting the public – in essence, unsuspecting, unwilling, nonconsenting, innocent, surprised, or likely-to-be offended or corrupted types of viewers – from the sight of offensive activities and materials."  People v. McNamara, 78 N.Y.2d 626, 631 (1991) (holding that the interior of parked vehicle in well lit area was not a public place). To constitute public lewdness, the act must take place "(a) in a public place or (b) in private premises under circumstances in which he may be readily observable from either a public place or from other private premises, and with the intent that he be so observed." Prosecutions for public lewdness may arise from an act of masturbation or other sexual conduct undertaken in full public view.  See, e.g., Matter of Paul R., 131 A.D.2d 764, 516 N.Y.S.2d 790 (2d Dep't 1987) (noting that if juvenile appellant had been an adult, he would have been guilty of a public lewdness offense for openly masturbating in the window of a private residence while uttering obscene comments); People v. Darryl M., 123 Misc. 2d 723, 726, 475 N.Y.S.2d 705, 709 (N.Y. City Crim. Ct. 1984) ("In the instant case, defendant's actions of repeatedly stroking his covered erect penis in public, in addition to rubbing his covered erect penis against the buttocks of three females, in public, is exactly the kind of behavior which the Legislature intended to encompass by utilizing the phrase 'any other lewd act' in the context of § 245.00.").

The jury considered evidence that the Port Authority conducted intensive sweeps that resulted in high numbers of public lewdness arrests during short bursts of time.  While, as the defendants point out, there is nothing per se unconstitutional about

law enforcement sweeps, the plaintiff's <u>Monell</u> claim was premised on the contention

that the Port Authority had an established practice of arresting men for public lewdness in

the men's room at the World Trade Center's PATH station concourse without regard to

probable cause.  Officer Nunziato, who arrested Martinez for public lewdness, testified

that he personally observed Mr. Martinez openly and publicly masturbating at one of the

men's room urinals.  (Trial Tr. at 251)  By contrast, Mr. Martinez testified that he merely

urinated and had never masturbated in a public bathroom.  (Trial Tr. at 69, 76)  The jury

credited the testimony of Mr. Martinez over the testimony of Officer Nunziato as to the

circumstances of the arrest.  From Mr. Martinez's testimony, the jury concluded that Mr.

Martinez was arrested without probable cause.

   In his questioning of Officer Miller, the plaintiff's counsel pointed out that

the documentation of the public lewdness arrests contained nearly identical descriptions

of the circumstances surrounding the acts of public lewdness.  (Trial Tr. at 289-91)

Although Martinez was the only one of the seven individuals arrested on February 1 who

testified, the jury had before it the documents pertaining to each of the arrests, and heard

testimony pertaining to the circumstances of these arrests, which happened in rapid

succession over approximately two-and-a-half hours.

   In addition, Mr. Martinez testified that while he was in police custody,

Officer Nunziato explicitly stated that the arrests were made pursuant to a quota:

> Q. Now, during the time that these things were going on, what was the
> general demeanor of the police officers, the three police officers in the
> room?
> A. They humiliated us. . . .  And he said, no, you're going to be here until
> we finish the paperwork and we make our quota.
> Q. Were there any other conversations that you heard between – well, first
> of all, who was the police officer who said that?
> A. Nunziato.

(Trial Tr. 79-80)[4]  The jury was entitled to credit Mr. Martinez's testimony as establishing that the Port Authority had a custom of performing public lewdness arrests pursuant to a quota.  Moreover, Mr. Martinez testified that Officer Miller said to Officer Nunziato, "oh, how fast, you caught one really fast," to which Nunziato replied, "well, I set a good trap."  (Trial Tr. at 71)  The jury also had before it documents describing each of the seven arrests.  The jury was entitled to conclude that the testimony of the officers was not credible, and that based on the exhibits and testimony, these arrests occurred without probable cause.

The jury also was entitled to credit the defendants' testimony that the Port Authority did not train its officers as to the procedures for conducting directed enforcements.  Officer Sbarra testified that he did not personally provide training as to public lewdness arrests, and Officer Nunziato testified that he received no formal training on how to conduct directed enforcement actions.  (Trial Tr. at 237, 243)  Officer Callaghan indicated, however, that he received training from other officers and from assistant district attorneys.  (Trial Tr. at 313)

The defendants' post-trial motion argues that the officers' lack of training is immaterial to the Monell claim, a contention that has no basis in law.  A municipality's policy or custom may be demonstrated in its failure to train or supervise officers.  City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89 (1989).  Liability attaches "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Id. at 388.  In Dodd v. City of Norwich, 827 F.2d 1, 5 (2d Cir.

---

[4] Defendants' counsel did not contemporaneously object to this testimony.  Had defendants objected or moved to strike this testimony, it nonetheless would have been admissible against Nunziato for the truth of its content because it constitutes an admission by a party-opponent.  Fed. R. Evid. 801(d)(2).  The other defendants sought no limiting instruction.

1987), the Second Circuit held that a Monell claim arose when a city trained a police officer to handcuff a suspect while holding a gun, thus posing a risk that the gun could discharge against the suspect during an altercation.  See also Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756 (2d Cir. 2003) (affirming district court's denial of defendant's summary judgment motion, since questions of fact existed as to whether the municipality's training or lack thereof caused officer's fatal shooting of a fleeing suspect).  If a municipality is aware that inadequately trained employees will enforce a policy, but elects not to train them, the municipality may incur liability.  Amnesty America v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004) (citing City of Canton, 489 U.S. at 387).

Nunziato's testimony made clear that the arrest procedures employed during a sweep differed from typical arrest procedures, with paperwork and processing performed on an expedited basis.  (Trial Tr. at 276-77)  The jury may logically have inferred that the practices of the Port Authority during the sweep differed from the practices used in a routine arrest, and that the officers were not trained to conduct arrests during a sweep so as to comport with the constitutional guarantee that a person not be arrested except upon probable cause to believe that he has committed a crime.

Although the jury was supplied with evidence sufficient to conclude that the Port Authority had a custom that led to widespread public lewdness arrests without regard for probable cause, it may also have concluded that the Monell violation arose from a "decision officially adopted and promulgated by [the Port Authority's] officer[]." Monell, 658 U.S. at 690.  A single unconstitutional act may establish Monell liability, provided that it occurred under the direction of a person whose edicts or acts reflect

official policy.  Rookard v. Health & Hosp. Corp., 710 F.2d 41, 45 (2d Cir. 1983).  As

Judge Lumbard observed, "[t]he difficulty, of course, lies in identifying those officials

whose actions, because they may fairly be treated as the municipality's own actions,

establish policy.  Where an official has final authority over significant matters involving

the exercise of discretion, the choices he makes represent government policy.  An official

has final authority if his decisions, at the time they are made, for practical or legal reasons

constitute the municipality's final decisions."  Id. (citation omitted).  Monell liability is

not predicated on whether a given official is a policymaker, but rather, whether the

official has been delegated authority in a manner that his or her decision may be "fairly

attributable to the municipality."  Id. at 45 n.3.

       Nunziato and Miller testified that Sbarra – who held the title of

commanding officer at the time – directed the sweep of February 1.  (Trial Tr. at 245)

Sbarra described his title as that of "assistant chief, police chief of patrol for the Port

Authority Police."  (Trial Tr. at 205)  In his deposition, Sbarra testified that he was the

commanding officer of the WTC PATH station at the time of Martinez's arrest; at trial

Sbarra testified that he was the "operations captain" and reported to a commanding

officer.  (Trial Tr. at 205-06)  At the time of the February 2000 sweep, Sbarra had 100

officers working under his command.  (Trial Tr. at 206)  He was responsible for police

activity at 13 stations in the PATH system.  (Trial Tr. at 207)  Officer Sbarra testified as

follows:

> Q. Your job overall, one way of saying your job was you were in charge
> of addressing criminal activity that you suspected was going on or came to
> light in the PATH train stations?
> A. Yes.
> Q. You were in charge of directing operations to deal with specific
> criminal problems that might occur?

> A. Yes.
> Q. One of those problems was public lewdness in some of the public
> bathrooms.  Is that right?
> A. That was one of the problems, yes.
> Q. Now, part of your job was to review the arrest that officers under your
> command did make, correct?
> A. Yes.

(Trial Tr. at 208)  Given the evidence as to Sbarra's responsibility over the individual

defendants and his decision to direct sweeps targeted to public lewdness arrests in the

PATH station men's room, the jury, in the context of all other evidence, could reasonably

conclude that he established a policy that prompted widespread public arrests without

regard to probable cause.

Therefore, considering the trial evidence as a whole, I conclude that a

reasonable jury could have concluded that the Port Authority had a policy, custom or

practice of initiating public lewdness arrests as part of "sweeps" to clear the restrooms of

persons subjectively viewed by the Port Authority as undesirable, regardless of whether

there was probable cause to make the arrests.

B.  <u>Defendants were not entitled to an instruction regarding Mr. Martinez's
pantomime at the criminal trial</u>

As part of his defense to the criminal charge, Mr. Martinez was asked by

his lawyer at trial "to stand up and simply show us by pantomime, if you understand what

I mean, the motions you made with your hand as you finished urinating before you

zipped up your pants and left.  Just show us how you urinated that day."  (Criminal Trial

Tr. at 64)  Martinez mimicked the motions he made while securing his zipper at the

men's room urinal.  (Criminal Trial Tr. at 64)  After the demonstration, his lawyer at the

criminal trial stated as follows:  "Let the record reflect that Mr. Martinez made a motion

that could be misled [sic] as an up and down, back and forth motion with his hand as he's

finished pretending urinating." (Criminal Trial Tr. at 65) I admitted Martinez's counsel's description of the pantomime from the criminal trial, but denied defendants' request to have Martinez engage in a reenactment of the pantomime. This, defendants assert, was error.

The defendants conducted Martinez's deposition on January 28, 2004, at which point their attorney asked Mr. Martinez to reenact the pantomime he performed at the criminal trial. Plaintiff's counsel objected, and the parties telephoned Magistrate Judge Eaton for a ruling as to whether Mr. Martinez must perform the pantomime. Magistrate Judge Eaton ruled that it was sufficient for Mr. Martinez to verbally describe his gestures, and that a pantomimed reenactment was unnecessary. (Martinez Dep. at 43-45, 49-51)

Thereafter, defendants' argued that the plaintiff's failure to perform the pantomimed demonstration was deliberate and that the defendants were entitled to have the court instruct the jury that it should draw a negative inference because the plaintiff did not perform the pantomime. Defendants also argued that Mr. Martinez should be precluded from reenacting a pantomime performed during his criminal trial.

I noted that Magistrate Judge Eaton had previously directed that there be no pantomime, and that the parties had informally raised the issue at a pretrial conference before me. (Trial Tr. at 36) I also stated on the record that I had previously upheld Magistrate Judge Eaton's ruling, and had obtained plaintiff's counsel's representation that the plaintiff would not rely upon any in-court pantomime as part of his case. (Trial Tr. at 36)

During trial, the defendants' counsel questioned Martinez about the pantomime gestures in the criminal trial.  (Trial Tr. at 187)  Mr. Martinez confirmed that he motioned with his hands to reenact the appearance of zipping up his pants once he finished urinating.  (Trial Tr. at 187, 196)  At that time, I instructed the jury that, prior to the commencement of trial, I had ruled that Mr. Martinez did not need to perform the pantomime, and that it would be adequate for him to verbally describe his gestures. (Trial Tr. at 195)  In questioning Mr. Martinez, the defendants' counsel quoted from the on-the-record description of the pantomime made at the underlying criminal trial.  (Trial Tr. at 197)  Mr. Martinez stated that he agreed with his counsel's characterization of his gestures at the criminal trial.  (Trial Tr. at 197-98)

Defendants' specific point is that plaintiff obtained an acquittal in the criminal trial by performing a demonstration of action that, in defendants' view, would have been sufficient to establish probable cause for his arrest.  However, ordering a reenactment of the events of February 1, 2000 would have had slight probative value. The physical gestures would be imprecise, and there would be no adequate way for a jury to compare the gestures it viewed with the gestures seen by Judge Torres or those that occurred on February 1, 2000.

The pantomime risked creating unfair prejudice, a confusion of the issues, and misleading the jury.  Rule 403, Fed. R. Evid.  Martinez described the experience of performing the pantomime at his criminal trial as being "very, very difficult, very embarrassing, very embarrassing."  (Trial Tr. at 203)  If it was error to exclude the demonstration, defendants were not prejudiced by it.  Of far greater probative value was plaintiff counsel's description of the reenactment to Judge Torres, which was published

to the jury over plaintiff's objection.  (Trial Tr. at 196)   Specifically, the jury was

informed that at the conclusion of the demonstration in the criminal trial, Martinez's

counsel stated: "Let the record reflect that Mr. Martinez made a motion that could be

misled [sic] as an up and down, back and forth motion with his hand as he's finished

pretending urinating."  (Trial Tr. at 196)  Martinez confirmed that it was an accurate

representation.  Defendants were free to argue to the jury that the plaintiff's conduct was

sufficiently close in resemblance to public masturbation to give rise to probable cause.

     C.   <u>The summations in Mr. Martinez's criminal trial were not evidence, and
were properly excluded from trial</u>

       Defendants contend that the Court erred by excluding certain comments

made by plaintiff's counsel, Michael Spiegel, during his closing argument at the

underlying criminal trial.  The Joint Pretrial Order contained the parties' stipulation to the

admission of the entire transcript of the criminal action.  Plaintiff's counsel later sought

to exclude the following passage from Mr. Spiegel's summation:

> I suppose it is possible that Police Officer Nunziato mistook the innocent
> gesture of Mr. Martinez finishing up urinating for a lewd act.   And I
> suggest that that raises a reasonable doubt as to whether or not what was
> actually being engaged in the bathroom that day was a lewd act or was a
> totally innocent hand motion which is routinely made by men at urinals.

(Criminal Trial Tr. at 75)

       A final pretrial order may be modified to prevent manifest injustice, Rule

16(e), Fed. R. Civ. P., and I permitted the plaintiff to object belatedly to a small, non-

testimonial portion of the transcript.  I ruled that, consistent with <u>United States v.

McKeon</u>, 738 F.2d 26 (2d Cir. 1984), Mr. Spiegel's statements of advocacy at the

criminal trial were inadmissible.  <u>McKeon</u> observed that an admission of fact by an

attorney made during argument may be admitted at a subsequent trial.  <u>Id.</u> at 30 (citing

Oscanyan v. Arms Co., 103 U.S. 261, 263 (1880)).  McKeon held, however, that
"[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to
weaknesses in the prosecution's case or invitations to a jury to draw certain inferences
should not be admitted." Id. at 33. Moreover, any inconsistency "should be clear and of a
quality which obviates any need for the trier of fact to explore other events at the prior
trial." Id.  To be admissible evidence in a later action, counsel's statements during
argument must be the equivalent of testimonial statements uttered by a party. Id.; see
also Maurizio v. Goldsmith, 84 F. Supp. 2d 455, 464 (S.D.N.Y. 1999) (arguments made
in state court briefs were of an argumentative nature, and not admissions of fact), aff'd,
230 F.3d 518 (2d Cir. 2000).[5]

        Mr. Spiegel's comments in closing argument in the criminal trial fall
within the category of speculation that McKeon deemed inadmissible.  His remarks were
couched purely as supposition and suggestion.  In "suppos[ing] that it is possible" that
Officer Nunziato mistook Mr. Martinez's gestures for an act of public lewdness, Mr.
Spiegel made an argument as to whether the state satisfied the burden of proof in the
criminal trial.  His observation as to what Nunziato may have seen was framed as a
theory and a matter of speculation.  As such, Spiegel was offering a hypothetical scenario
and theorizing as to Officer Nunziato's state of mind when he arrested Mr. Martinez.
This falls within McKeon's concerns as to not admitting speculations of counsel or
invitations to draw inferences.  McKeon, 738 F.2d at 30.  In contrast, applying McKeon

---

[5] Defendants cite to Rothstein v. Carriere, 373 F.3d 275 (2d Cir. 2004), as support for their contention that
Mr. Spiegel's summation should have been admitted.  Although it considered a malicious prosecution
claim under New York law, Rothstein's relevance to the admissibility of Mr. Spiegel's prior summation is
not clear.  Another opinion cited by the defendants, United States v. Bakshinian, 65 F. Supp. 2d 1104,
1107-08 (C.D. Cal. 1999), evaluated McKeon in a context specific to federal prosecutions, and held that the
government is entitled to less leeway under McKeon than is a criminal defendant.  Bakshinian did not
address facts analogous to those here.

to plaintiff's counsel's factual description of the so-called pantomime, I concluded, over plaintiff's objection, that it contained a sufficient factual basis to have the qualities of an admission and allowed it into evidence.

Lastly, if I was in error in this regard, there was no prejudice to the defendants because any factual content in the omitted portion of the summation quoted above was substantially cumulative of plaintiff's counsel's description of the so-called pantomime, which I allowed into evidence.

The defendants' motion, to the extent premised on this ground, is denied.

D.   <u>No missing witness charge was warranted as to Rosalba and Dr. Fogari</u>

At trial, the defendants requested that the Court give the jury a missing witness instruction as to an individual named Rosalba,[6] and a physician named Dr. Fogari, who prescribed certain anti-anxiety medications to Martinez.

Then, as now, the defendants' basis for seeking a missing witness charge was not altogether clear.  Defendants argue that these witnesses were available to the plaintiff, "and without reason he failed to call them (or to identify them per Rule 26)." (Def. Mem. Pt. V)  They cite to <u>Magee v. Paul Revere Life Ins. Co.</u>, 178 F.R.D. 33 (E.D.N.Y. 1998), in which the district court upheld discovery sanctions levied by a Magistrate Judge upon a party that failed to produce a key witness, and <u>McDowell v. Eagle Trans. Corp.</u>, 303 A.D.2d 655, 656, 758 N.Y.S.2d 79, 80 (2d Dep't 2003), in which the New York Appellate Division, Second Department, held that a missing witness charge should have been given as to four physicians who might have acted as third-party witnesses in an insurance dispute.

---

[6] Rosalba is also identified as "Rose Alba" and "Rosealba."  All three spellings appear in the transcript and in the parties' submissions.

Defendants' arguments as to the necessity of a missing witness charge have no basis in governing law.  United States v. Torres, 845 F.2d 1165, 1169 (2d Cir. 1988), explained the conditions that necessitate a missing witness charge:

> When a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction and fails to produce such witnesses, the jury may infer that the testimony, if produced, would be unfavorable to that party.  However, when a witness is equally available to both sides, the failure to produce is open to an inference against both parties.  No instruction is necessary where the unpresented testimony would be merely cumulative.

(quotation marks and internal citations omitted; emphasis in original).  In the context of instructing on evidentiary inference, witness availability implicates the totality of circumstances including the witness's relation to the parties, not just physical presence or accessibility.  Id. at 1170.  "[C]ourts have been reluctant to find a witness practically unavailable when it appears that the defense has no real interest in calling the witness to the stand, but merely is engaged in a form of gamesmanship in an effort to obtain a missing witness charge."  Id.  It is within the trial court's "sound discretion" whether to issue a missing witness charge.  Id. at 1170-71.

According to Martinez's testimony, Rosalba is a social worker at a gay community center in New York, the Gay and Lesbian Anti-Violence Project.  (Trial Tr. at 94)  For about a year after his arrest, Martinez met with Rosalba for counseling sessions.  (Trial Tr. at 95)  Rosalba did not charge for their sessions, and recommended that Martinez visit a psychologist or psychiatrist.  (Trial Tr. at 181-82)  She ultimately referred him to Barbara Fried, who testified at trial.  (Trial Tr. at 182)

At plaintiff's deposition, defendants' counsel questioned Mr. Martinez about his sessions with Rosalba. (Martinez Dep. at 98-99, 102, 105-06)  He also

questioned him about treatment administered by Dr. Fogari, whose role apparently was

limited to prescribing anti-anxiety drugs.  (Martinez Dep. at 14, 17, 112-13)  In his

opposition papers, the plaintiff contends that Rosalba's identity and last known address

were contained in medical records in the defendants' possession, a contention that the

defendants do not dispute.  These materials were introduced at trial as Exhibit 20.

Because the defendant was aware of Rosalba and Dr. Fogari prior to commencement of

trial, and did not seek to call them, a missing witness instruction is not warranted.

Lastly, in his closing argument, the defendants' counsel commented on the

plaintiff's decision not to call Rosalba as a witness.  (Trial Tr. at 583, 586)  He stated the

following:

> Who was Ms. Rosalba?  Why wasn't she called?  Wouldn't she have a
> better idea of exactly what his initial complaints were after the arrest?  Or
> maybe she wasn't called because the plaintiff, in discussing this
> retraumatization that he suffered because of the arrest, admitted to Ms.
> Rosalba that he was in fact guilty of public lewdness.  Where is the
> physician?

(Trial Tr. at 586)  In Torres, the Second Circuit observed that, assuming arguendo the

trial court erred in not issuing a missing witness instruction, any error was remedied

when the trial court permitted counsel to address any possible inferences during

summation.  845 F.2d at 1170.  Thus, even if a missing witness charge was warranted as

to Rosalba, defendants remedied that error by attempting to draw inferences as to her

absence.

In the Joint Pretrial Order, the defendants indicated that they intended to

call Dr. Fogari as a witness.  (JPTO at 6)  They elected not to do so.

The defendants' motion, to the extent that it is premised upon the failure to

give a missing witness charge for Rosalba or Dr. Fogari, is denied.

E.  It was Not Error for Adamowicz and Fried to Testify

Defendants next contend that Frank Adamowicz (who is Mr. Martinez's life partner of 24 years) and Ms. Fried should have been precluded from testifying because they were not identified in Mr. Martinez's Rule 26(a)(1) initial disclosures.

In pretrial argument of the defendants' in limine motion, counsel contended that the plaintiff violated Rule 26 by waiting until three weeks before trial to state his intention to call Adamowicz and Fried, rather than disclosing their identities at an earlier point in time.  (Trial Tr. at 26)  Plaintiff's counsel argued that his failure ought to be excused because this lawsuit commenced on January 30, 2001, less than two months after the "initial disclosures" provisions of Rule 26(a)(1) became mandatory in this District, and neither plaintiff nor defendants served automatic disclosures.  (Trial Tr. at 28)

Defendants' did not serve any discovery requests until the discovery period closed.  (Trial Tr. at 26-27)  The defendants served no interrogatories, requests to admit, or notices of deposition.  (Trial Tr. at 27)  Not until discovery closed, and the plaintiff amended his complaint to voluntarily dismiss claims of negligence and conspiracy and add an additional theory to his Monell claim did the defendants' counsel serve a written discovery request.  (Trial Tr. at 26)  Significantly, when defendants' counsel questioned Mr. Martinez at his pretrial deposition, counsel inquired about the counseling that Ms. Fried provided, and about the nature of Mr. Martinez's relationship with Mr. Adamowicz.  (Martinez Dep. at 4-5, 78, 81, 85, 99, 102-05)

Defendants were not prejudiced by the late addition of Adamowicz and Fried to the witness list.  Prior to trial, on October 29, 2004, I directed plaintiff's counsel

to make Adamowicz and Fried available to have their depositions taken in order to cure

any prejudice that the plaintiff's late listing caused to the defendants.  Defendants'

counsel then telephoned Mr. Spiegel, who told him that Mr. Adamowicz shared an

address with Mr. Martinez, and that Ms. Fried's address was included in materials

already produced to the defendants.  (Trial Tr. at 31)  Plaintiff's counsel informed

defendants' counsel that Mr. Adamowicz was available for deposition at a time of the

defendants' choosing.  (Trial Tr. at 31-32)  According to the plaintiff's counsel,

defendants' counsel did not subsequently call with a deposition date.  (Trial Tr. at 32)  As

to Ms. Fried, plaintiff's counsel telephoned her in an effort to find a suitable deposition

date.  (Trial Tr. at 32)  Either a relative or a family friend had been involved in an

accident, and Ms. Fried was away on travel.  (Trial Tr. at 32)  Plaintiff's counsel arranged

a potential deposition date, which he then communicated by fax to the defendants'

counsel.  (Trial Tr. at 32)  The date was Friday, November 12, with the trial scheduled to

commence the following Monday.  (Trial Tr. at 33)  Defendants' counsel did not respond

to the fax, and offered the following explanation to the Court:

> Mr. Spiegel sent me a fax on November 6, which was a Saturday.  In
> effect it was November 8.  And I did not respond to that.  And frankly, I –
> and I'll be quite honest with the Court – I felt that at this time offering her
> deposition on November 12 was something that I just could not comply
> with, that I would not be able to make myself available on November 12
> to take the deposition of a witness for a trial that was supposed to start
> today. . . .  It was just impossible.  And I declined to respond to Mr.
> Spiegel.

(Trial Tr. at 33-34)  At that point, I noted that I previously had made myself available to

the parties to resolve any conflicts that might arise over the scheduling of depositions.

(Trial Tr. at 34)  Although the defendants' counsel wrote to Mr. Spiegel on November 3,

2004 complaining that he had not been provided with witness addresses and copied that

letter to the Court, defendants' counsel made no application for relief as to the depositions of either Adamowicz or Fried.  Defendants made no effort to seek the Court's intervention on scheduling matters or to seek a brief adjournment of the trial.

A trial court has discretion to preclude testimony as a sanction for discovery violations.[7]  As Judge Koeltl noted in Ebewo v. Martinez, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004), "[c]ourts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution."  Many courts in this District have found that "flagrant bad faith" and "callous disregard" of the Federal Rules are necessary prerequisites to witness preclusion.  See, e.g., Ward v. National Geographic Society, 2002 WL 27777, at *2 (S.D.N.Y. Jan. 11, 2002).

True, Adamowicz and Fried were not identified as trial witnesses until relatively late in this litigation.  When Adamowicz and Fried were identified as trial witnesses approximately three weeks prior to trial, I declined to preclude them as trial witnesses but instead required the plaintiff to make them available for depositions.  When defendants encountered scheduling difficulties for the depositions, they sat on their rights.  I conclude that by failing to pursue the depositions of Adamowicz and Fried after I ordered them to be made available, the defendants waived a court-ordered remedy that would have cured or eliminated any possible prejudice.  Any lingering prejudice to the defendants was self-inflicted.

---

[7] Rule 37(c)(1) states in part:  "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."

The defendants' motion, to the extent that it is premised on the late addition of Adamowicz and Fried to plaintiff's witness list, is denied.

F.   Plaintiff's arguments on summation were not improper

Defendants argue that a new trial is warranted because in Mr. Spiegel's closing argument, he alluded to the choices and motives of other persons arrested for public lewdness.  According to the defendants, the plaintiff's counsel "was asking the jury improperly to identify with plaintiff . . . urge[d] the jury to speculate and to accept Spiegel's un-sworn testimony about evidence in the criminal trial, and to consider hearsay conversations from unidentified individuals."  (Def. Mem. at Pt. VII)

During his summation, plaintiff's counsel suggested that Mr. Martinez's arrest and prosecution, both of which he claimed were pursued without probable cause, illustrate the reasons why similarly positioned arrestees did not challenge their arrests and instead pleaded guilty to disorderly conduct violation.  (Trial Tr. at 608)  Defendants' counsel promptly objected, at which point, in the middle of the plaintiff's summation, I instructed the jury that they may not engage in speculation, and only should draw reasonable inferences.  (Trial Tr. at 608-09)  I thereafter sustained the defendants' objection to a different statement in Mr. Siegel's summation, which implied that the individual defendants were aware of the typical resolution of public lewdness arrests. (Trial Tr. at 610-11)  I reminded the jury that a lawyer's argument does not constitute evidence, and that the jury's recollections of fact control.  (Trial Tr. at 611)  During the plaintiff's summation, I overruled defendants' objections to, inter alia, plaintiff's argument that an innocent person would be unlikely to challenge a public lewdness arrest because of the stigma attached for being prosecuted for such conduct; plaintiff's

27

reference to Martinez's criminal acquittal; and plaintiff's argument as to why the pantomime occurred at the criminal trial.  (Trial Tr. at 612-13, 19)

Contrary to the assertions of defendants' counsel, Mr. Spiegel did not offer fact testimony in his summation, or engage in impermissible speculation.  Based on my review of those portions of the trial transcript cited by the defendants, Mr. Siegel's argument was well within the boundaries of fair comment on the evidence.  His statements did not exceed the bounds of the trial evidence, nor did he encourage the jury to engage in impermissible speculation.  In the instance where I sustained the defendants' objection, I addressed the jury to remind them that their recollection must control their determinations as triers of fact.  Also, in my preliminary instructions to the jury and again in my closing instructions, I informed the jury that lawyers' arguments are not evidence. (Trial Tr. at 37, 636-37)  If the defendants desired a more particularized instruction to the jury, they should have requested it.

Because plaintiff's summation contained nothing more than fair argument as to permissible inferences to be drawn from the evidence, the defendants' motion for a new trial, to the extent premised upon this ground, is denied.

### G. Ms. Fried did not offer expert testimony, and her fact testimony was permissible

Defendants argue that Barbara Fried testified as a de facto liability expert. They contend that her status as an "expert witness," coupled with the late notice they received of plaintiff's intention to call her, should have precluded Fried's testimony.  The argument is meritless.

Fried describes herself as a social worker and psychotherapist.  (Trial Tr. at 410)  Martinez was referred to her for counseling, and Ms. Fried testified about her

yearlong treatment of Martinez.  (Trial Tr. at 411)  Ms. Fried did not offer any opinion on

causation or future damages.

A witness may qualify as an expert if he or she is "specially employed to

provide expert testimony in the case," or if "duties as an employee of the party regularly

involve giving expert testimony."  Fed. R. Civ. Proc. 26(a)(2)(B).  In Byrne v. Gracious

Living Industries, Inc., 2003 WL 446474, at *2 (S.D.N.Y. Feb. 25, 2003), Judge Kaplan

differentiated the roles of a treating physician and those of an expert.  "A treating

physician who is called to testify on information acquired solely in that role, as opposed

to giving an opinion formulated for trial, is not an expert for purposes of Rule

26(a)(2)(A)."  Id.  Byrne observed that most courts hold that so long as a witness testifies

solely to the patient's treatment or care, he or she is not a witness subject to the written

report requirements of Rule 26, notwithstanding any opinion testimony he or she may

offer.  Id.

The Advisory Committee Notes to the 1993 amendments of Rule 26(a)(2)

state: "A treating physician, for example, can be deposed or called to testify at trial

without any requirement for a written report."  Byrne observes that the expert disclosure

rules intend to allow the opposing party to take effective discovery of an expert, a

concern that is irrelevant when the opposing party is aware of the treating physician's

identity and is not prejudiced by his or her testimony.  2003 WL 446474, at *2.  See also

Derienzo v. Metropolitan Transit Authority & Metro-North Rail Road, 2004 WL 67479,

at *2 (S.D.N.Y. Jan 15, 2004) ("[A] doctor is not precluded from testifying to facts

learned and opinions formed in the course of treatment by virtue of the fact that a party

did not make the expert disclosures required under Rule 26(a)(2) because the doctor is

not an 'expert' subject to the Rule."); <u>Zanowic v. Ashcroft</u>, 2002 WL 373229, at * 2

(S.D.N.Y. Mar. 8, 2002) ("[t]here can be no serious dispute" that a treating physician is

"free to testify to opinions he formed" during treatment without submitting an expert

disclosure pursuant to Rule 26(a)(2)) (collecting cases); <u>Chiquita Int'l Ltd. v. M/V Bolero

Reefer</u>, 1994 WL 177785, at *1 (S.D.N.Y. May 6, 1994) ("[T]he relevant distinction is

not between fact and opinion testimony but between those witnesses whose information

was obtained in the normal course of business and those who were hired to make an

evaluation in connection with expected litigation.").

   The defendants point to no testimony that can be characterized as expert

testimony.  During the course of her testimony, plaintiff's counsel asked whether Ms.

Fried observed signs indicating that Mr. Martinez suffered from sexual compulsions.

(Trial Tr. at 429)  Defendants' counsel objected, and I instructed Ms. Fried to limit her

testimony solely to what she observed during the course of treatment.  (Trial Tr. at 429-

430)  Ms. Fried testified that she "saw no signs whatsoever of sexual compulsivity or any

kind of acting out . . . ."  (Trial Tr. at 430)  Her testimony was limited to what she

observed from her treatment of Mr. Martinez.

   Prior to trial, defendants' counsel pointed to Ms. Freed's desired hourly

fee of $125 as indicia that she would testify as an expert.  The Code of Professional

Responsibility permits a fact witness to be paid "[r]easonable compensation . . . for the

loss of time in attending, testifying, preparing to testify or otherwise assisting counsel."

DR 7-109(c)(2), 22 N.Y.C.R.R. § 1200.40.  The payment of fees to Ms. Freed did not

render her an expert.

Lastly, the defendants argue that Ms. Fried's testimony "is worthless" because on cross-examination, she testified that she did not evaluate Mr. Martinez's truthfulness during their sessions.  (Def. Mem. at Pt. VIII)  However, that argument goes to the weight of her testimony, not to its admissibility.

### H.  Officer Miller

Defendants argue that this Court should find that plaintiff established no prima face case against Officer Miller, and that the claim against him should be dismissed on the basis of qualified immunity.  Because the jury returned a verdict finding no liability on the part of Officer Miller, these arguments are moot, and I do not consider them.

### 2.  Defendants' Motions to Remit Plaintiff's Damage Award

The defendants argue that the damage awards against them are excessive as a matter of law and should be subject to remittitur.  Having viewed the evidence as a whole and reviewed the damage awards in comparable false arrest and malicious prosecution trials, I conclude that remittitur is appropriate as to the award for "[e]motional distress, mental anguish and loss of liberty damages" arising from Martinez's false arrest, from an amount of $1,000,000 to $360,000.  I do not remit the $1,000 in therapy expenses on the false arrest claim, the $100,000 in damages for "[e]motional distress and mental anguish damages" on the malicious prosecution claim, or the $3,000 in legal expenses awarded on the malicious prosecution claim.

Three witnesses testified as to the damages incurred by Mr. Martinez: Barbara Fried, Frank Adamowicz, and Mr. Martinez himself.  Plaintiff also introduced

Ms. Fried's notes from the 41 therapy sessions that she conducted with Mr. Martinez during the course of her treatment of him.

Further description of the events of February 1, 2000 is helpful in understanding the nature of the injuries that Martinez incurred.  As Martinez exited the WTC PATH Station men's room, he heard a whistle, and Callaghan and Nunziato motioned him toward them.  (Trial Tr. at 70)  They instructed Martinez to wash his hands in the men's room; when Mr. Martinez asked why, Officer Nunziato told Martinez that he had been masturbating in the men's room.  (Trial Tr. at 70, 76)  According to Martinez, when he denied so doing, Officer Nunziato responded, "Are you calling me a liar?  If you want, I can break your teeth."  (Trial Tr. at 76-77)  Martinez testified that he was one of seven individuals in custody for public lewdness, and the officers "were laughing at us," and that Nunziato said to them, "oh, so why don't you go to the gay places, you faggot, you queer."  (Trial Tr. at 79-80)  Martinez testified that while he was being processed at 100 Centre Street, "everybody was laughing at us" and mocking the arrestees.  (Trial Tr. at 89)  He also testified that he was injured because Callaghan placed him in handcuffs that were too tight.  (Trial Tr. at 82)  He was released from custody at approximately 1 a.m., roughly 19 hours after his arrest.  (Trial Tr. at 93)

Martinez testified that after the arrest, he experienced sleeplessness, loss of appetite, and bouts of anxiety.  (Trial Tr. at 97)  For a period of time, he stopped working as a volunteer at senior citizen functions, attending church, and going to sporting events.  (Trial Tr. at 98-100)  Martinez testified that in the weeks after his arrest, he briefly contemplated suicide.  (Trial Tr. at 106)  He did not travel to Cuba to visit his ill mother for fear that the arrest would preclude re-entry to the United States.  (Trial Tr. at

103)  During this post-arrest period, Mr. Martinez allowed his previously filed application for U.S. citizenship to lapse because he "was afraid of going to Immigration and [he] was afraid of going to jail or being deported."  (Trial Tr. at 66)

Martinez ultimately received therapy from Rosalba and Ms. Fried.  (Trial Tr. at 181-83)  Fried concluded that Martinez suffered from post-traumatic stress syndrome.  (Trial Tr. at 419)  She testified that he was uncomfortable leaving his home, and had fears of being followed.  (Trial Tr. at 423)  She testified that he expressed being anxious in the presence of law enforcement officers, even those whom he already knew personally.  (Trial Tr. at 423-24)  Fried confirmed that Martinez expressed to her that he had contemplated suicide.  (Trial Tr. at 424)  She also testified that Martinez reported physical symptoms, such as feelings of coldness and numbness.  (Trial Tr. at 443-44)

Frank Adamowicz, who resides with Martinez and whose relationship with Martinez has been formalized as a domestic partnership, (Trial Tr. at 450) testified as to the damages Mr. Martinez incurred following his arrest and prosecution. Adamowicz testified that Martinez became withdrawn, and was uneasy with routine outings and social gatherings.  (Trial Tr. at 458-59)  Adamowicz corroborated Martinez's account that he was uneasy in the presence of police officers, even those whom he knew personally.  (Trial Tr. at 459, 474-75)  Martinez also made utterances that referred to the possibility of his death, Adamowicz testified.  (Trial Tr. at 461)  Adamowicz testified that he observed Martinez display physical symptoms, and that Martinez's "was no longer the person he was prior to that event."  (Trial Tr. at 468)

On June 21, 2000, Martinez and Adamowicz were traveling through the World Trade Center while on their way to a court appearance in Martinez's criminal

prosecution.  (Trial Tr. at 101)  While on an escalator, Martinez heard someone shout his

name, and saw that it was Officer Nunziato.[8]  (Trial Tr. at 101)  Nunziato and Callaghan

were together.  (Trial Tr. at 101)  According to Martinez, Nunziato was waiting for him,

and when he saw Martinez and Adamowicz, "he cracked up laughing."  (Trial Tr. at 101)

Nunziato followed them through the concourse.  (Trial Tr. at 101)  Hoping that Nunziato

would stop following him, Martinez stepped into a retail establishment.  (Trial Tr. at 102)

Martinez testified that when he exited the store, he saw Nunziato and Callaghan standing

outside.  (Trial Tr. at 102)  He testified that Nunziato was striking the palm of his hand

with a rolled-up newspaper, and that "he was looking at me and smiling at the same

time."  (Trial Tr. at 102)  Adamowicz corroborated this account.  (Trial Tr. at 465)

Martinez testified that he was "terrified" by the encounter.  (Trial Tr. at 102)

       "[W]here the jury has found a constitutional violation and there is no

genuine dispute that the violation resulted in some injury to the plaintiff, the plaintiff is

entitled to an award of compensatory damages as a matter of law."  Kerman v. City of

New York, 374 F.3d 93, 124 (2d Cir. 2004).  Compensatory damages may include out-of-

pocket expenses and other monetary harms, and arise from injury to reputation, personal

humiliation, and mental anguish and suffering.  Memphis Community School Dist. v.

Stachura, 477 U.S. 299, 307 (1986).  Similarly, a plaintiff unlawfully deprived of liberty

is entitled to compensatory damages for the loss of "intangible rights."  Kerman, 374

F.3d at 124.  The damages recoverable for the loss of liberty are separable from damages

caused by physical harm, embarrassment, or emotional suffering.  Id. at 125-26.

---

[8] Adamowicz testified that Nunziato spoke Martinez's name in "a loud voice" and that the name was "scream[ed]." (Trial Tr. at 462)

A jury award should not be sustained "where the damages awarded are so excessive 'as to shock the judicial conscience.'" Raucci v. Town of Rotterdam, 902 F.2d 1050, 1058 (2d Cir. 1990) (quoting Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 750 (2d Cir. 1984)).  A court also must pay "due deference to the fact-finding role of the jury" when evaluating claimed excessive damages.  Gardner v. Federated Dep't Stores, Inc., 907 F.2d 1348, 1353 (2d Cir. 1990).  "[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts."  Memphis Community School Dist., 477 U.S. at 306.  As Judge Schwartz observed, damages arising out of an emotional distress claim are not always easily translated into a dollar amount, and the law does not provide a precise formula for reducing such injuries to a monetary value. Sulkowska v. City of New York, 129 F. Supp. 2d 274, 308 (S.D.N.Y. 2001) (citing Mathie v. Fries, 121 F.3d 808, 814 (2d Cir. 1997)).  However, it is appropriate for a court considering a motion for remittitur to consider the value of jury awards that arose from the same cause of action.  See, e.g., Gardner, 907 F.2d at 1353.

The jury's awards of damages for false arrest or malicious prosecution redress different phases in Martinez's ordeal.  Damages on a false arrest claim compensate for injuries from the beginning of custody to arraignment, and malicious prosecution damages compensate for post-arraignment injuries.  Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir. 1992).  In turn, false arrest is subdivided into two compensatory components:  (1) deprivation of liberty and (2) tangible injury, which includes physical harm, embarrassment, and emotional suffering.  See Kerman, 374 F.3d at 125-26.  "[T]he damages for deprivation of liberty redress the denial of free movement and the violation

done to [an individual's] dignity as a result of the unlawful detention, and not the physical and mental injuries arising from the incident." Gardner 907 F.2d at 1353. Thus, damages awarded for deprivation of liberty are independent of damages awarded for physical and mental injuries, and deprivation of liberty damages may be awarded even in the absence of physical or mental harm. Kerman, 374 F.3d at 126 (citing Woodard v. City of Albany, 81 A.D.2d 947 (3d Dep't. 1981)). As to Martinez's false arrest claim, the verdict form, agreed upon by the parties, did not require the jury to award damages for loss of liberty separate from damages arising from emotional distress and mental anguish. The jury charge made clear the governing standard for each component of the award. Therefore, I separately analyze the two components of the $1,000,000 false arrest award: emotional injury and the loss of liberty.

A. Plaintiff's False Arrest Award

False arrest awards vary widely. When adjusted to 2005 dollars, they have generally ranged between $10,000 and $300,000.[9] See Gardner, 907 F.2d at 1353 (ordering the remittitur of a $300,000 jury award to $200,000 (roughly $297,000 in 2005 dollars) for approximately 8 hours of imprisonment); Roundtree v. City of New York, 208 A.D.2d 407 (1st Dep't 1994) (ordering a remittitur amount to $200,000 (roughly $262,000 in 2005 dollars) for 3.5 days of imprisonment); Stile v. City of New York, 172 A.D.2d 743 (2d Dep't 1991) (ordering a remittitur amount of $150,000 (roughly

_____

[9] Prior jury verdicts and judicial remittiturs are proper benchmarks in deciding the highest amount of an award that is not shocking to the judicial conscience. Consorti v. Armstrong World Industries, Inc., 72 F.3d 1003, 1013 (2d Cir. 1995), rev'd on other grounds, 518 U.S. 1031 (1996). Here, rather than merely offering the observation that, for example, in comparing a ten-year-old award to the jury's actions in this case, there should be some upward adjustment for inflation, I have used a perhaps crude adjustment mechanism provided by the United States Bureau of Labor Statistics on its website. (http://data.bls.gov/cgi-bin/cpicalc.pl) Of course, using such a mechanism de hors the record for directly calculating a party's damages would be impermissible. Here, I used it as nothing more than a tool in looking at case law that, itself, provides a benchmark. I note that the plaintiff utilized a different online inflation calculator on a site maintained by the National Aeronautics and Space Administration.

$214,000 in 2005 dollars) for 28 hours of imprisonment); Martinez v. Gayson, 1998 WL 564385, at *6 (E.D.N.Y. June 30, 1998) (ordering a remittitur amount of $160,000 (roughly $191,000 in year 2005) for five hours of imprisonment); Bert v. Port Authority of New York and New Jersey, 166 A.D.2d 351, 351 (1st Dep't 1991) (awarding $100,000 (roughly $142,000 in year 2005) for three hours of imprisonment and humiliation); Hollender v. Trump Village Co-op., 97 A.D.2d 812 (2d Dep't 1983) (ordering a remittitur amount of $10,000 (roughly $19,000 in year 2005) for false arrest); Mason v. City of New York, 949 F. Supp. 1068, 1076 (S.D.N.Y. 1996) (ordering a remittitur amount of $10,000 (roughly $12,400 in year 2005) for 2 hours of imprisonment).

Two prior jury awards are particularly helpful in analyzing the quantum of damages awarded to Martinez.  In Sulkowska, the plaintiff protested the city's unlawful seizure of her establishment, a bar.  129 F.Supp.2d at 283–84.  She was falsely arrested and imprisoned for approximately a half-day, without physical injury.  In a bench trial, Judge Schwartz awarded her $275,000 ($302,020 in 2005 dollars) for past and future pain and suffering.  Id. at 309.  The court concluded that malicious prosecution damages would be minimal, since the plaintiff's injuries were primarily attributable to her arrest and pre-arraignment detention, so the award amount effectively was compensation for false arrest.  Id. at 307.

In Komlosi v. Fudenberg, 2000 WL 351414, at *16 n.12 (S.D.N.Y. 2000), the plaintiff, a psychologist, was falsely accused of sexually abusing patients.  Id. at *2-3.  While his employer commenced an internal investigation, law enforcement arrested him and filed charges of rape and forcible sodomy.  Id. at *3. He remained in custody for two weeks, and although the charges against him ultimately were dismissed, the accusations

garnered press attention, including an article in the New York Post.  Id. at *3.  The

plaintiff undertook psychiatric therapy and was diagnosed with post-traumatic stress

disorder.  Id.  At trial, the jury awarded the plaintiff $6.6 million on his false arrest and

malicious prosecution claims, approximately $5.23 million of which was to compensate

for non-economic loss.  Id. at *15.  The district court granted remittitur of non-economic

damages to $500,000.  Id. at *17.

Other false arrest awards have exceeded this range, but were

undifferentiated lump sums that arose from multiple torts.  See Ismail v. Cohen, 899 F.2d

183 (2d Cir. 1990) (upholding a lump sum award of $650,000 in compensatory damages

(roughly $967,000 in 2005 dollars) for deprivation of constitutional rights,

discrimination, assault, battery, false arrest, malicious prosecution, and abuse of process).

I first consider the award for the loss of liberty that Martinez suffered as a

result of the false arrest.  I conclude that Martinez should be compensated for his loss of

liberty in the sum of $160,000.  In Gardner, the plaintiff was falsely arrested and accused

of theft by security guards in a Manhattan department store.  Gardner, 907 F.2d at 1353.

After store security held Gardner, threatened him, and called him a "blond faggot," he

was handed over to the police and transferred to Central Booking to be imprisoned an

additional six hours.  Id.  During this time, Gardner was assaulted and sustained multiple

physical injuries, resulting in jaw injury, hearing impairment, and ear inflammation.  Id.

at 1350–51.  At trial, the jury awarded $650,000 for pain and suffering and $150,000 for

deprivation of liberty.  Id. at 1351.  On appeal, the Second Circuit surveyed the then-

existing damages awards for the loss of liberty in comparable false arrest cases, and

concluded that the sum of $150,000 "exceeds awards sanctioned in similar New York

cases."  The Second Circuit granted a remittitur of damages for deprivation of liberty from $150,000 to $50,000.  Id. at 1353.

Martinez was held for approximately 2.5 times the duration of Gardner's imprisonment. [10]   I take this into account in concluding that in light of the circumstances of Martinez's arrest, an award of $160,000 for deprivation of liberty does not shock the judicial conscience.  Martinez's confinement lasted from just after 6 a.m. on February 1 until shortly after midnight on February 2.  Accepting the jury's conclusion that Martinez was falsely arrested during a typical morning commute and unlawfully held for a period of time extending late into the night, an award of $160,000 is not inconsistent with other false arrest awards, and is not a sum that shocks the judicial conscience.

I now consider the false arrest damages for mental anguish and emotional distress.  "The measure of damages for pain and suffering or emotional distress is . . . not easily translated into a dollar amount.  Consequently, the law does not provide a precise formula by which pain and suffering and emotional distress may be properly measured and reduced to monetary value."  Sulkowska, 129 F.Supp.2d at 308.  Other courts have given substantial awards for emotional distress resulting from false arrest.  See Gonzalez v. Bratton, 147 F. Supp.2d 180, 208-09 (S.D.N.Y. 2001) (upholding a compensatory award of $250,000 for emotional distress resulting from a false arrest that included a physically invasive strip search).

On the evidence before the jury, an award above $200,000 would exceed a permissible award for the pain and suffering that Martinez faced as a result of the false arrest.  Martinez was not subjected to physical assault.  The evidence supports a

---

[10] Gardner was held for an undisclosed period of time at the store and an additional six hours at Central Booking.

conclusion that he experienced considerable anguish because of his arrest.  This included

sleeplessness, loss of appetite, anxiety bouts, cessation of social, volunteer, and church

activities, ideations of suicide, and concerns about his immigration status.  (Trial Tr. at

97-100, 103, 106)  Much of Martinez's testimony was corroborated by the testimony of

Ms. Fried and Mr. Adamowicz.  Martinez also allowed his application for U.S.

citizenship to lapse out of fear that the arrest would have repercussions on the process.

(Trial Tr. at 66)  The jury credited Martinez's testimony, and in light of the injuries to

which he testified and the damages awarded in comparable cases, including <u>Gonzalez</u>, an

award of $200,000 does not shock the judicial conscience.

 Lastly, the jury's award of $1,000 for the plaintiff's therapy bills does not

shock the judicial conscience.

 B. <u>Plaintiff's Malicious Prosecution Award</u>

 The jury awarded $100,000 on Martinez's malicious prosecution claim.  I

conclude that remittitur is unwarranted as to this award.  Martinez appeared in state trial

court to defend himself from the charge of public lewdness, a highly stigmatizing charge.

The jury in this case concluded that Martinez was prosecuted without probable cause.

Martinez stated that the trial made him feel desperate, nervous, and "like a madman."

(Trial Tr. at 96–97)  Jurors also heard testimony from Martinez and Adamowicz about

the intimidating conduct of Nunziato on June 21, 2000 while Martinez was en route to a

court appearance.  (Trial Tr. at 101-02, 465)  The damages awarded for malicious

prosecution are in line with other awards for the same tort.  <u>See</u> <u>King v. Macri</u>, 993 F.2d

294 (2d Cir. 1993) (upholding a $75,000 award for a malicious prosecution claim

($100,950 in 2005 dollars)); <u>Gentile v. County of Suffolk</u>, 926 F.2d 142 (2d Cir. 1991)

(upholding a $75,000 award for a malicious prosecution claim ($107,100 in 2005 dollars)).

   The jury award for Martinez's malicious prosecution claim is consistent with other jury awards, and that remittitur is not appropriate.  In addition, the jury's award of $3,000 in attorneys' fees expended by Martinez in the underlying criminal trial is consistent with the evidence and does not shock the judicial conscience.

 3. <u>Plaintiff's Motion for Attorneys' Fees</u>

   Section 1988 to Title 42 of the U.S. Code provides attorneys' fees for the prevailing party in an action under 42 U.S.C. §1983: "[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."  "[A] prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 429 (1983) (quoting S. Rep. No. 94-1011, p. 4 (1976), U.S. Code Cong. & Admin. News 1976, p. 5912).  Although the fee awards vary with the facts of each case, two questions govern whether attorneys' fees should be awarded:  "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"  <u>Id.</u> at 434.  "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."  <u>Id.</u> at 435.

   Following <u>Hensley</u>, the <u>quantum</u> of attorneys' fees should be determined by "the number of hours reasonably expended on the litigation multiplied by a reasonable

hourly rate." Id. at 433.  The party seeking fees should submit evidence showing hours

and rates, and the absence of evidence may warrant a reduced award.  Id.  Courts also

should be alert to excessive fee requests, signaled by overstaffing and redundant billing.

Id. at 434.  "[T]he fee applicant bears the burden of establishing entitlement to an award

and documenting the appropriate hours expended and hourly rates.  The applicant should

exercise 'billing judgment' with respect to hours worked, and should maintain billing

time records in a manner that will enable a reviewing court to identify distinct claims."

Id. at 437 (internal citation omitted).  Attorneys' rates should be calculated "in line with

those prevailing in the community for similar services by lawyers of reasonably

comparable skill, experience and reputation."  Blum v. Stenson, 465 U.S. 886, 896

(1984).  In addition to attorneys' fees, a section 1988 award may include out-of-pocket

expenses incurred by an attorney that ordinarily are charged to clients.  LeBlanc-

Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998).

   In scattershot fashion, the defendants oppose the plaintiff's application for

attorneys' fees.  Their opposition includes a reiteration of the defendants' disagreement

with the jury's verdict; defendants' skepticism as to the existence of a retainer agreement

between Mr. Martinez and his counsel; an assertion that Mr. Martinez's employment in

food services for a major insurance underwriter indicates that he can afford to pay his

own attorneys' fees; an argument that some of the plaintiff's document discovery proved

unfruitful; an argument that no fees should be awarded for the work of any attorney other

than plaintiff's lead trial counsel; and an assertion that the 25 hours expended on the

plaintiff's in limine motions was excessive.

In opposing the application for attorneys' fees, the defendants have not shown that the plaintiff's employment status is relevant to the application, nor have they set forth a basis in law as to how a retainer agreement or the defendants' disagreement with the jury verdict would inform the Court's disposition of the attorneys' fees issue.  I therefore reject these arguments as bases for not awarding attorneys' fees.

I consider the defendants' argument that attorneys' fees should be limited because, they contend, the plaintiff's document discovery was unfruitful.  Defendants argue that prior to taking the depositions of the defendants, the plaintiff engaged in extensive document discovery of the Port Authority in search of documents to support the plaintiff's assertion that an anti-homosexual bias influenced the Port Authority's conduct. Defendants assert that because there was no documentary evidence to support this theory, "discovery was futile from its inception and indefensible as strategy."  (Def. Mem. at 3) Presumably, this argument is directed toward Hensley's initial threshold question of whether the plaintiff prevailed on his claims.

Although the trial court has discretion to reduce a lodestar fee based on the number of hours expended on a severable, unsuccessful claim, see Green v. Torres, 361 F.3d 96, 98 (2d Cir. 2004) (per curiam), the defendant has not raised any authority showing that attorneys' fees should be reduced when document discovery relevant to a plaintiff's successful claims does not produce a smoking gun.  I note that the jury found in the plaintiff's favor on his Monell claim that the Port Authority conducted sweeps without regard to probable cause.  Pretrial discovery into the Port Authority was necessary for the prosecution of this action, and the plaintiff contends that the round of

discovery that defendants frame as meritless yielded documents that were introduced as

trial exhibits, and helped to frame counsel's questioning of witnesses at trial.

Although that round of document discovery may not have yielded a

smoking gun, there is no evidence indicating that it was frivolous, dilatory or otherwise

constituted harassment.  See Kennelly v. State of Rhode Island, 682 F.2d 282, 283 (1st

Cir. 1982) (per curiam) (upholding attorneys' fees award for plaintiff's police misconduct

claim because "[i]n the course of pretrial discovery, it was incumbent upon plaintiffs'

counsel to explore the degree of participation of the municipal defendants in the incident

in question.").  Based on the record before me, I conclude that plaintiff's attorneys' fees

should not be reduced based on the results of this round of document discovery.[11]

I next consider the defendants' argument that any award should exclude

plaintiff's attorneys other than Mr. Spiegel.  Defendants posit that, because Mr. Spiegel

was lead trial counsel responsible for witness examinations and arguments to the jury, all

work performed by his co-counsel was duplicative and unnecessary.  Although the

defendants' rationale is not altogether clear, they appear to argue that because all of the

evidence and most of the legal argumentation in this action was funneled through

Spiegel, only Spiegel's time should have been included in an attorneys' fees award.

The plaintiff proffered comprehensive time records for the following

individuals: 1.) Michael Spiegel, plaintiff's lead trial counsel; 2.) Alicia Amezcua, a

lawyer and associate of Mr. Spiegel; 3.) Irum Taqi, another lawyer and associate of Mr.

Spiegel; 4.) Jeffrey Rothman, another of Mr. Spiegel's associates; 5.) Larissa Chernock, a

paralegal; and 6.) Lauren Stephen-Davidowitz, another paralegal.  (Spiegel Dec. Exs. A,

---

[11] Elsewhere in their papers, defendants single out one of Mr. Spiegel's associates, Jeffrey A. Rothman,
arguing that Mr. Rothman's discovery work should not be covered by attorneys' fees.  Because this
discovery was not without merit, I reject this contention.

C-D)  Plaintiff also submits a declaration from Joshua Fuld Nessen, a former associate of

Spiegel's whose billing records were lost in the attacks of September 11, 2001.  (attached

at Spiegel Dec. Ex. C)  Mr. Nessen proffers copies of memoranda that reflect the results

of his legal research for this case, and estimates that he spent at least 40 hours working on

this matter.  (Nessen Dec. ¶ 7)  Scott A. Korenbaum, who assisted with legal arguments

at trial, has submitted a declaration setting forth details as to the hours worked and

services rendered since October 2004.  (Korenbaum Dec. Ex. B)   Plaintiff also proffers

documentation supporting the $6,050.26 costs incurred in litigating the claim, including

copying expenses, costs for on-line computer research, and transcript preparation fees

and compensation for a courtroom interpreter.  (Spiegel Dec. Ex. E)

              The defendants have not directed the Court to any portion of the record to

support their contention that plaintiff's attorneys engaged in redundant services.

Defendants challenge the work performed by Ms. Amezcua.  (Spiegel Dec. Ex. C)  She

spent roughly 17 hours researching and writing the motion to compel, approximately 10

hours drafting and researching the Complaint, and approximately four hours drafting

interrogatories.  (Spiegel Dec. Ex. C)  Mr. Spiegel spent approximately 2.5 hours

reviewing and revising the Complaint, approximately one hour working on plaintiff's

interrogatories, and approximately 13 hours researching and writing the motion to

compel.  (Spiegel Dec. Ex. A)  I do not consider these amounts of time excessive or

redundant.  Similarly, there appear to be no redundancies or excesses in the billing

records of Mr. Taqi, who spent a total of 9.8 hours preparing discovery materials that

were provided to the defendants, drafting a letter to opposing counsel on discovery

issues, and drafting the First Amended Complaint.  (Spiegel Dec. Ex. C)  Defendants also

argue that the paralegals utilized in this case performed redundant tasks, an assertion that they do not support with any citation to the record.  I reject the defendants' contention that the services rendered by Mr. Spiegel, his present and former associates and paralegals were excessive, redundant or otherwise improper.

Defendants have not set forth any basis for the Court to deny attorneys' fees incurred by Mr. Korenbaum, who was co-counsel at trial but not a part of Mr. Spiegel's law firm.  Defendants argue that it was excessive for Mr. Korenbaum and Mr. Spiegel to spend 25 hours researching and drafting in limine motions.  (Def. Mem. at 5) Moreover, they contend that Mr. Korenbaum's trial presence was redundant.  (Def. Mem. at 5)  Both of these contentions are without merit.  The 25 hours spent on the in limine motions was not excessive given the evidentiary issues implicated therein.  In addition, Mr. Korenbaum's trial role focused on the legal and evidentiary issues that arose, as well as witness preparation.  (Korenbaum Dec. ¶ 13)  This was neither an unreasonable nor duplicative allotment of trial responsibilities.

I conclude that the fees incurred by the plaintiff's attorneys are sought for prevailing claims, and that the plaintiff achieved a level of success in his claims that warrant an award of attorneys' fees under 42 U.S.C. § 1988.

Next, I consider whether the hourly rates sought by the plaintiff are reasonable.  "The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel."  Blum, 465 U.S. at 886.  "The legislative history explains that 'a reasonable attorney's fee' is one that is 'adequate to attract competent counsel, but ... [that does] not

produce windfalls to attorneys.'"  Id. at 897 (ellipsis and alteration in original).  Coming

on the heels of Hensley, Blum reinforced that attorneys' fees under section 1988 should

be based upon an attorney's reasonable hours times a reasonable rate.  Id. at 897.

   Plaintiff proffers declarations from two attorneys experienced in litigating

police misconduct actions.  Robert L. Herber states that in 2002, he was awarded fees at

the then-current rate of $400 per hour.  (Herbst Dec. ¶ 11, attached at Spiegel Dec. Ex. B)

Jonathan C. Moore also states that in 2003, he was awarded compensation at the rate of

$400 per hour.  (Moore Dec. ¶ 10, attached at Spiegel Dec. Ex. B)  These declarations are

uncontested by the defendants.

   Mr. Spiegel's customary rate is $400 per hour.  (Spiegel Dec. ¶ 34)  Mr.

Korenbaum's customary rate is $325 per hour.  (Korenbaum Dec. ¶ 9)  These rates are in

keeping with other hourly rates found reasonable by courts in this District.  Davis v. New

York City Housing Authority, 2002 WL 31748586, at *3 (S.D.N.Y. Dec. 6, 2002) ($375

a reasonable hourly fee for seasoned litigator with eighteen years' experience); Gonzalez

v. Bratton, 147 F. Supp. 2d 180, 211-12 (S.D.N.Y. 2001) (collecting cases, with $425 per

hour the highest rate cited).  These hourly rates are warranted in light of Mr. Spiegel's

and Mr. Korenbaum's experience.  Mr. Spiegel received his law degree from New York

University in 1984, and subsequently clerked for a judge in this District.  (Spiegel Dec. ¶

3)  He has been litigating constitutional claims since 1985, including police misconduct

cases.  (Spiegel Dec. ¶¶ 3-5)  Mr. Spiegel has litigated more than 20 police brutality cases

and has represented a small number of death-eligible criminal defendants.  (Spiegel Dec.

¶¶ 9-10)  Mr. Korenbaum has practice law for sixteen years, including five years at the

New York City Law Department defending police misconduct actions and other constitutional law claims.  (Korenbaum Dec. ¶¶ 5, 8)

Mr. Spiegel spent a total of 490.9 hours on this case.  (Spiegel Dec. ¶ 34)  Mr. Korenbaum spent 107.7 hours.  (Spiegel Dec. ¶ 36)  Mr. Spiegel's associates recorded 159.1 hours on this case, at the rate of $150 per hour, and his paralegals recorded 40.6 hours at the rate of $75 per hour.  (Spiegel Dec. ¶¶ 37-38)  The billing records are detailed as to the tasks performed by each attorney, and billed to the tenth of an hour.

Considering that this action was actively litigated for nearly four years, including multiple discovery disputes, a moderate level of document production, five depositions, and preparation for and the conduct of a four-day trial, plaintiff's attorneys 757.7 total hours (including the time of paralegals) is not unreasonable.  Moreover, based on the uncontested declarations of Mr. Herber and Mr. Moore, and the declarations of Mr. Korenbaum and Mr. Spiegel as to their hourly rates, I conclude that the hourly rates are reasonable.

Having reviewed the billing records of plaintiff's attorneys and their staff, I grant plaintiff's application for costs and attorneys' fees in the amount of $264,322.76.

Conclusion

The defendants' motions pursuant to Rule 50 and Rule 59, Fed. R. Civ. P., are DENIED, except to the extent that the defendants seek a new trial and/or remittitur of the jury award on the false arrest claim.  A new trial on compensatory damages (other than therapy expenses) arising out of the plaintiff's false arrest claim is GRANTED, unless plaintiff accepts remittitur of damages on the false arrest claim (other than for

therapy expenses) from $1,000,000 to $360,000.  Plaintiff shall, in a written submission

to be filed with the Court within 10 days hereof, accept or reject the amount as remitted.

If remittitur is accepted, plaintiff's total damages (excluding attorneys'

fees) would be $464,000.

The plaintiff's application for costs and attorneys' fees is GRANTED in

the sum of $264,322.76.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 2, 2005